IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

JOHN GERUNDO

v.                                        C.A. NO. 14-5171

AT&T, INC., et al.

**MEMORANDUM OPINION**

SCHMEHL, J.                              DECEMBER 22, 2015

Plaintiff brought this action, claiming that he was terminated by the defendants in violation of the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). Presently before the Court is the defendants' motion for summary judgment. For the reasons that follow, the motion is denied.

Plaintiff was born in 1947 and was 65 years old at the time he received notice of his termination. At the time of his termination, plaintiff had worked for defendants and their predecessor for nearly 43 years. Plaintiff worked for defendants as a Service Executive in the defendants' Signature Client Group ("SCG"). (ECF 37, Ex. A pp. 21-22, 24). Beginning around the middle of 2012, and throughout the balance of his employment with defendant, plaintiff's supervisor was Renee Roth ("Roth")(DOB: July 7, 1956), who resides in Minnesota. (Id. p. 65-66); (ECF 37, Ex B, pp. 5, 10, 119, 129, 169). Beginning in 2012, and throughout the balance of plaintiff's employment with defendant, Roth's supervisor was Gary Jordan ("Jordan") (DOB June 13, 1961), who resides in Illinois. (ECF 37, Ex. A, p.65); (ECF 37, Ex. C, pp. 3, 21-22, 26-27). Plaintiff was the oldest of Roth's direct reports.

In 2010, defendants assigned plaintiff to replace one of the two Service Executives supporting Fiserv, one of defendants' largest and most demanding SCG clients. (ECF 37, Ex. A, pp. 43, 45, 46-47, 49-50).

In late 2012, Fiserv and defendants entered into an agreement, pursuant to which Fiserv elected to expand defendants' services. As a result of this expansion, defendants added two additional Service Executives to the Fiserv account.

In or around late January, 2013, defendant declared a "surplus event" within the SCG, whereby the defendants sought to "reduc[e] headcount to close a budget gap and . . . also restructur[e] to move some work to an outsourced provider while maintaining a focus on mobility products." (ECF 37, Ex. H, p.1).  Twelve Affected Work Groups ("AWGs") were involved in the surplus, across which a total of 47 positions were to be eliminated. (Id.).  Plaintiff was a Service Executive in AWG No. 5, where six of the 51 Service Executive Positions ultimately reporting to Jordan were to be eliminated, thus leaving 45 Service Executives in AWG No. 5. (Id. pp. 5-6).

As part of the surplus process, employees in each AWG were rated and ranked across the following four categories: Performance, Leadership, Skills and Experience. (ECF 37, Ex. H, p. 6). Each category weighted 25 per cent, leading to a total score for each employee. The ratings for Performance and Leadership were based on the 2012 final year rankings. The categories Skills and Experience were new categories that were added to the ratings and rankings process as part of the surplus event. The ratings and rankings were not based on an employee's length of time with a particular client, but on his overall ranking within the organization. (ECF 37, Ex. B, pp. 314-15). Based on these four equally-weighted criteria, plaintiff received a final ranking of

2.75 which was comprised of Performance (3), Leadership (3), Skills (2) and Experience (3).

Jordan testified that he gave plaintiff a rating of "2" in "Skills" and a "3" in "Experience" to "stay consistent with [Roth's year-end] rankings." (ECF 37, Ex. C, p. 59). Roth testified that plaintiff received a "2" in the Skills" category because, based on her observation and experience, she "felt that he was able to perform at a basic level given the expectation of his position." (ECF 37, Ex. B, p. 227). Roth testified that plaintiff had just a basic skill level with respect to excel spreadsheets and access database. (Id. p. 228).

Roth testified that plaintiff received a "3" in the "Experience" category because "[m]ost of the work he had been doing was around maintenance and trouble tickets for the customer. And in the new environment, Fiserv was going to be ordering a lot more complex services that would require additional knowledge and skills to support, and I didn't feel that he had that knowledge base." (ECF 37, Ex. B, p. 320).

Based on this rating and ranking process occurring as a result of the surplus event, plaintiff and five other Service Executives in AWG No. 5 placed "below the line" and were, therefore, selected for surplus status. (ECF 37, Ex. L, p. 4).

Roth testified that plaintiff ranked near the bottom because 1) he was not on site at Fiserv's data center in Philadelphia as often as the client would have liked him to be. (ECF 37 Ex. B. pp. 40-41); 2) he demonstrated an "unwilling[ness] to learn new products and services and new processes, tools and to gain the skills necessary to support the client going forward. (Id., p. 75); 3) he failed to complete his Service Executive certification training by December, 2012. (Id. 46-47, 257-58, 260).

Plaintiff received his Surplus Notification Letter on March 1, 2013. (ECF 37, Ex. A, p.

3

121). As an employee placed on surplus status, plaintiff was provided with two options: he could 1) continue his employment with defendant through April 30, 2013, and, during that time, apply for other positions within the Company; or (2) choose to terminate employment effective March 22, 2013. (ECF 37, Ex. M, p. 18). Plaintiff chose the first option and remained with defendants through April 30, 2013. In June, 2013, plaintiff began receiving his pension benefits.

Maritza Gonzalez ("Gonzalez"), one of the 45 Service Executives in AWG No. 5 not placed on surplus status was transferred in mid-March 2013 to "absorb" the work performed by plaintiff on the Fiserv account. (ECF 37, Ex. B. pp. 310-11, 316, 324). At the time, Gonzales was 36 years old and had no experience working on the Fiserv account. (ECF 40-11, pp.6, 15). As of May 4, 2015, Gonzalez had been employed with defendants for 17 years. (Id., p.6).

The average age of all employees in the 12 AWG's prior to the reduction in force (362 employees) was 49.20. The average age of the employees remaining after the reduction in force (315 positions) was 48.96.

**STANDARD OF REVIEW**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

4

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. and N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

### APPLICABLE LAW

Under the ADEA, an employer is prohibited from discharging any individual or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment, because of an individual's age. 29 U.S.C.§ 623(a)(1). When analyzing claims under the ADEA and PHRA[1] where, as here, there is an absence of direct evidence of discrimination, the Court applies the burden-shifting framework set forth in McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973). Ordinarily, to make out a prima facie case under McDonnell Douglas in an ADEA case, "the plaintiff must show (1) that he was at least forty years of age or older, (2) that the defendant took an adverse employment action against the plaintiff), (3) that he was qualified for the position in question and (4) that the plaintiff was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009). However,

---

[1]The Court will analyze plaintiff's claims under the ADEA and PHRA together. See Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996)(stating that Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts).

where, as here, an employee is terminated during a reduction in force, the fourth prong of the prima facie case becomes if the "employer retained a sufficiently younger employee" who was similarly situated to the plaintiff. Anderson v. CONRAIL, 297 F. 3d 242, 249 (3d Cir. 2002)(internal quotation marks omitted).

Establishment of a prima facie case creates a presumption of discriminatory intent that a defendant has the a burden to rebut by setting forth some legitimate non-discriminatory reason for its actions. McDonnell Douglas, 41 U.S. at 802. If the employer does so, the presumption of discrimination drops out and the plaintiff must then "demonstrate that the employer's proffered rationale was a pretext for age discrimination." Smith v. City of Allentown, 589 F.3d at 689.

In order to demonstrate pretext, plaintiff "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." Iadimarco v. Runyon, 190 F.3d 151, 165-66 (3d Cir. 1999)(emphasis in original)(quoting Fuentes v. Perskie, 32 F. 3d 759, 764 (3d Cir. 1994)).

Plaintiff cannot "simply show that [defendant's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [defendant], not whether [defendant] is wise, shrewd, prudent, or competent." Fuentes, 32 F.3d at 765. Instead, plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that [defendant] did not act for the asserted non-discriminatory reasons." Id. (emphasis in original). Ultimately, plaintiff must prove

6

that age was the but for cause of his termination. <u>Gross v. FBL Financial Services, Inc.</u>, 129 S.Ct.

2343, 2352 (2009).

## DISCUSSION

Plaintiff has established a prima facie case of age discrimination as he was 65 years old at

the time he was surplussed, he was qualified and was replaced by a younger Service Executive,

Maritza Gonzalez (Age 36) who was similarly situated to plaintiff.[2] The defendants have

articulated a legitimate non discriminatory reason for the adverse employment action based on

the results of a rating and ranking process which took place pursuant to a reduction in force.

With regard to pretext, the Court finds that plaintiff has offered the following evidence

from which a fact finder could reasonably disbelieve defendants' stated reasons for terminating

plaintiff or find that defendants were more likely than not motivated by discrimination:

1. Plaintiff consistently received good performance reviews and positive feedback from

Fiserv.[3] For example, plaintiff's performance review for 2010 includes the following remarks:

> In the last half of 2010, Jack solidified his role with Fiserv. His area of focus is
> service assurance. Jack met expectations with the exception of exceeding
> expectations in his focus on our 4 key initiatives.
>
> Jack was especially effective in 3 of our 4 key initiatives (be proactive, enhanced level of

---

[2] Defendants assert that plaintiff has failed to prove the fourth element of a prima facie case because it was Jordan who made the decision to terminate plaintiff and the record reveals that Jordan did not know plaintiff's age. The Court finds that there is a question of material fact as to who made the decision to actually terminate plaintiff and whether or not his age was known. Roth testified that she made the decision to terminate plaintiff's employment. (ECF 37-2, p. 11). Jordan testified that Roth made the recommendation to terminate plaintiff, but that he made the ultimate decision. (ECF 37-3, p. 47).

[3] See Sheridan v. E.I. DuPont de Nemours and Co., 100 F.3d 1061, 1073-74 (3d Cir. 1996)(en banc) (stating that an employee can show pretext in part by adducing "affirmative evidence of [his] own accomplishments").

7

engagement and defining the customer and experience). In his new role Jack is on-‑site at Fiserv's *Philadelphia data center*. He capitalized on this presence by building more and more stronger relationships with key Fiserv players, discovering & taking actions on their issues and being accountable for solutions. Fiserv's Senior Vice President advised 'Jack is a breath of fresh air.' Jack demonstrated strong leadership by assuming this new role with grace and openness;"

Well respected, valued team member.


(ECF 40, Ex. 9).

2. Plaintiff's performance review for 2011 includes the following remarks:

I have been to two meetings in Philly with Jack and the customers. It is very obvious that they value his efforts. George Petusky has told me that. 'Jack is what we need in a Service Executive. We bring him issues and he gets them to the right people to be taken care off." Jack is not the kind of person to say, not my job/not my table. The client appreciates and values that;"

His stewardship documents are first rate. He has a patient style that works great with a demanding client. He works very hard and is willing to put in the hours that are needed. He is focused on maintenance support and gets involved with some complicated issues. He escalates as needed, opens up cons and does the client executive notification process when required. He also pushes back on the client to make sure they are following our basic procedures and escalations on issues;

He is a self-starter who requires very little direct supervision. He is very remote of me but I have no concerns that he is always doing the right thing for AT&T and his client. He is also a good team players and has been willing to provide vacation support for his teammates;

Jack is an asset to AT&T and I am glad he is on my team.;

I appreciate Jack's focus on customer service and the positive impact he has on Fiserv by his on premise work there. The client values his work;

Jack does a great job of communications with his client, his sales team and the service management team. He keeps the client updated during critical events;

Jack has built a solid relationship across all of Fiserv. It is clear that they value what he has done for them and this makes him an asset for AT&T. These relationships bring him information and hints from the client about what is going on inside Fiserv.

(ECF 40, Ex. 10).

     3. Plaintiff's performance review for 2012 includes the following remarks:

Jack continues his good work in support of Fiserv. He is on the front line every
day either at the client's location in Philly or from his office working tickets. His
client respects the value that Jack provides them while working their issues;

Jack has reestablished stewardship at the Executive level. Every month a Fiserv VP-Ken
Windfelder joins the call. Ken has been very complementary of the information that is
provided. During recent talks about new SLA's Ken made clear that he likes what he is
getting in those reports;

Jack continued through 2012 as the primary contact for Fiserv's ticket escalations, which
take time and energy, and often bleed into the evening and weekend hours. With so many
varying business units and contacts, it can be challenging to keep everyone happy. Jack
works very diligently to do that, and knows who the key constituents are (e.g. Ken
Windfelder). In addition, Jack prepares the monthly stewardship reports, and provides
some of the analysis associated with it, especially trouble tickets. As we approached the
end of the year, the client executed the ETS contract along with the custom SLAs which
we are managing. The good news is that we are adding headcount to the team, and during
2013 Jack will have more opportunity to shine. Dividing up his current duties with other
team members will allow us to use Jack's strengths to greater success with the client;

Jack has done a good job of building relationships up and down at Fiserv. They value
what he does for them. They also provide him with information about what is really going
on.;

Jack's strength's are in working with different groups of people at AT&T and Fiserv. He
knows how to get these different groups to work as a team.

(ECF 40-9, Ex. 11).

     4. Windfelder confirmed many of these statements, (ECF 40-8, pp. 10-14, 22, 38), stated

that plaintiff did a good job and that he never heard any complaints about plaintiff from anyone

at Fiserv. (ECF 40-8, pp. 10-14, 22, 38, 106).

     5. At the time the decision to terminate plaintiff's employment was made, plaintiff was

9

the  longest-serving member on the Fiserv account. (ECF 37-3, p. 83). Jordan was clearly aware of this. (Id.).

6. For the 2011-2012 performance review periods, plaintiff's performance review ratings matched those of Gonzalez; both received a rating of "Meets and Exceeds Some" (ECF 37-3, pp. 112-115; ECF 40-9, 40-12, 40-10. 40-13).

7. For the 2010 performance review periods, plaintiff's performance review ratings matched those of Gonzalez with both receiving a rating of "Meets and May Exceed Some Goals." (ECF 37-3, pp. 116-117; ECF 40-8, 40-13).

8. Jordan testified that he could not point to any criteria that would explain why Gonzalez was rated higher than plaintiff in the categories of "Skills" and "Experience." (ECF 37-3, pp 124-25).

9. Gonzalez had no experience working on the Fiserv account.

10. Plaintiff testified that when he told Roth that the transfer of Gonzalez onto the Fiserv account did not make a bit of sense her response was, "don't worry about it, it's just statistics." (ECF 37-1, p. 138).

11. Roth had asked plaintiff to train Gonzalez. (Id.).

12. Roth testified that plaintiff ranked near the bottom because he was not on site at Fiserv's data center in Philadelphia as often as the client would have liked him to be (ECF 37 Ex. B. pp. 40-41). Although Windfelder testified that he discussed with plaintiff about being on site more often (ECF 40-8, p. 24), Windfelder also testified that he did not recall ever talking to Roth regarding plaintiff working off-site, but did state that plaintiff was an easy account executive to work with and that plaintiff did a good job. (ECF 40-8, pp. 26, 38).

10

13. Roth testified that another reason plaintiff ranked low is because he demonstrated an "unwilling[ness] to learn new products and services and new processes, tools and to gain the skills necessary to support the client going forward. (Id., p. 75). However, the only evidence in the record to support Roth's testimony is noted in the area of focus section on plaintiff's 2012 performance review which states that "Jack is focused on maintenance of Fiserv. Because of the box he has been placed in, he doesn't always get involved in new technology. When Jack has completed his certification he should look at taking time to learn about new services." A reasonable jury could interpret this statement to mean that defendants have placed plaintiff in a situation where it was difficult for him to improve his technological skills and that upon completion of his certification, he should try to find time to learn about new technology. A reasonable jury could conclude that the statement does not evidence an "unwillingness" on part of the plaintiff to learn new skills, but rather that defendants placed plaintiff in a demanding position where he does not have the time to learn new skills.

14. Roth also testified that plaintiff ranked low because he failed to complete his Service Executive certification training by December, 2012. (Id. 46-47, 257-58, 260). Plaintiff does not dispute that he did not complete his certification by the December of 2012. However, plaintiff apparently completed his training one month later in January of 2013. Moreover, a reasonable jury could conclude that the reason plaintiff did not timely complete his training is because of "the box" he was placed in by defendants in servicing the Fiserv account.

15. At the same time plaintiff was terminated, defendants elected to retain Jason Apple ("Apple") (33 years old) as a Service Executive and direct report to Roth who had substantially less experience than plaintiff. Both Apple and plaintiff had the exact same ratings on their 2012

11

performance reviews. (ECF 40-12). Yet, Apple was rated higher than plaintiff on the categories of "Skills" and "Experience." Roth was unable to point to any objective criteria to explain this discrepancy, which resulted in plaintiff being terminated and Apple being retained. (ECF 37-2, pp. 97-98, 244).

16. Jordan testified that managers could rank employees however they wanted to. (ECF 37-3, p. 96).

17. Jordan admitted that other than someone saying outright 'I don't like old people' there was no other way to make sure that age did not play a role in the rankings. (Id.).

18. Jordan admitted that all of the categories in the ranking system were subjective. (Id. pp 91-92).[4]

19. Jordan admitted that there was no way to objectively test why Roth rated plaintiff a "2" on skills.

20. Roth agreed that it was possible that if a manager wanted to get rid of an employee because of their age, they could just assign someone low scores on these categories which are subjective, and have that person fall toward the bottom of the list." (ECF 37-2, pp. 237-238).

21. Roth agrees that there was no objective way to test her rating plaintiff a "2" on skills and that there was no documentation to support the rating (ECF 37-2, p.p. 228, 234-235).

22. If plaintiff had received higher scores in both "Skills" and "Experience," he would have ranked high enough to avoid being surplussed, and the "Experience" score based on his years of service can certainly be questioned.

_____

[4] "'Subjective evaluations are more susceptible of abuse and more likely to mask pretext.'" Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 320 (3d Cir. 2000)(quoting Weldon v. Kraft, Inc., 896 F.2d 793, 798 (3d Cir. 1990).

23. Jordan and Roth both admitted that in deciding who should be surplussed, neither asked permission to review the particular employee's personnel file or resume. (ECF 37-3, p. 99; 37-2, p. 245). Jordan also testified that he did not talk to the employee's former supervisors or clients or review any prior performance reviews. (ECF 37-3, p. 99).

24. Lois Smith, the highest-level Human Resources Employee who supported the Service Management organization in 2013, testified that she did not give any guidance to the managers as to what guidelines they should be using to assess their employees. (ECF 40-13, p. 65).  Nor did she take any action to ensure that the managers were not rating employees a certain way to cover up any possible age bias. (Id. p. 135).

25. Peggy Bremner, one of Jordan's direct reports testified that she gave one of her direct reports, Sue Hubbard, false ratings so that Ms. Hubbard would be eligible for termination and qualify for a severance package. (ECF 40-11, pp. 39, 41, 46).

26. Although defendants have offered statistics showing that the average age of the remaining  employees in the 12 AWGs after the reduction in force was only slightly lower, plaintiff has offered statistics revealing that 42 of the 47 employees that were surplussed were 40 years of age or older and that all 21 of the Service Executives in the decisional unit who were terminated were 40 years of age or older.  (ECF 40-12).

27. On April 1, 2013, Roth received an email advising of two open positions, saying that they "want to look at our surplus employees that may be a fit for those jobs," and requesting for "honest input as to whether you feel your surplus employee should be considered for interview. ." Roth's only response was, "I would say no for Jack Gerundo." (ECF 40-14).

28. On April 11, 2013, Jordan became aware of an open position that "would be a good

fit for a Service Manager/Executive" in which he was asked if plaintiff and others would be a viable candidate. Jordan's response was, "I'll think I'll pass on this one." (ECF 40-14).

In closing, plaintiff only ranked below the line because he received low grades in two categories (Skills and Experience) that were just added to two existing categories (Performance and Leadership) in rating and ranking candidates for surplus. A reasonable jury could conclude that the many platitudes plaintiff received on his performance reviews did not match the ratings plaintiff received for "Skills" and "Experience," especially since the ratings were almost entirely subjective. Plaintiff has also cast sufficient doubt on the reasons Roth gave for giving plaintiff low scores on "Skills" and "Experience." Therefore, plaintiff has created a genuine issue of material fact as to whether he was terminated because of his age. Accordingly, the defendants' motion for summary judgment is denied.

14