IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOHN GERUNDO,<br><br>      **Plaintiff,**<br><br>  v.<br><br>AT&T SERVICES, INC.<br><br>      **Defendant.** | CIVIL ACTION<br>NO. 14-5171 |

**AMENDED MEMORANDUM OPINION**

**SCHMEHL, J. /s/ JLS**                                                              **DECEMBER 27 , 2016**

      Plaintiff brought this action, claiming he was placed on surplus status by his former employer, defendant AT&T Services, Inc., because of his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-629 and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. Ann. § 951. After the Court denied the defendant's motion for summary judgment, the case was tried to the Court sitting with a jury. After a five-day trial, the jury found, as indicated on the verdict form, that plaintiff had proven by a preponderance of the evidence that his age was the determining factor in the decision to surplus his employment in connection with a reduction in force. (ECF 91.) The jury awarded plaintiff $288,000.00 in back pay and $135,000.00 in front pay. (*Id.*).The jury further found that defendant had proven by a preponderance of the evidence that plaintiff did not exercise reasonable diligence in his efforts to secure substantially equivalent employment and, as a result, deducted $53,000.00 from the award of front pay, leaving a total front pay award of $82,000.00. (*Id.*) Finally, the jury found that plaintiff had failed to prove that defendant either knew or showed reckless disregard for whether its conduct was prohibited by the age

discrimination law. (*Id.*) The Court then entered a judgment in favor of plaintiff and against defendant in the amount of $370,000.00. (ECF 87.) Presently before the Court is the renewed motion of the defendant for judgment as a matter of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure. For the reasons that follow, the motion is denied.

### **OVERVIEW OF EVIDENCE**

Plaintiff was born in 1947 and was 65 years old at the time he received notice that he was being placed on surplus status. At the time of the surplus, plaintiff had worked for defendant and its predecessor for nearly 43 years and with defendant since 1999. Plaintiff worked for defendant as a Service Executive in the defendant's Signature Client Group ("SCG"). He mainly worked from his home in Macungie, Pennsylvania. Beginning around August, 2012, and throughout the balance of his employment with defendant, plaintiff's direct supervisor was Renee Roth ("Roth") (DOB: July 7, 1956) who resides and works in Minnesota. Roth met plaintiff on one occasion in the fall of 2012. Beginning in 2012, and throughout the balance of plaintiff's employment with defendant, Roth's direct supervisor was Gary Jordan ("Jordan")(DOB: June 13, 1961) who resides and works in Illinois. Jordan never met plaintiff and did not have access to plaintiff's personnel file. Plaintiff was the oldest of Roth's direct reports. In all, Jordan was responsible for 51 Service Executives, including plaintiff. Plaintiff was the oldest of Jordan's 51 Service Executives.

In 2010, defendant assigned plaintiff to replace one of the two Service Executives supporting Fiserv, one of defendant's largest and most demanding SCG clients. In late 2012, Fiserv and defendant entered into an agreement, pursuant to which Fiserv elected

to expand defendant's services. As a result of this expansion, defendant added two additional Service Executives to the Fiserv account.

In December, 2012, as part of the annual year-end review process, Jordan and his direct reports, including Roth, took part in calibration sessions to rank the 51 Service Executives.  On a scale of 1-5 with "1" being the poorest and "5" being the best, Roth gave plaintiff a "3" in each of several categories, including "Performance" and "Leadership." The criteria for these categories was subjective. The ratings and rankings were not based on an employee's length of time with a particular client, but on his overall ranking within the organization. At the time the year-end rankings were prepared in December, 2012, neither Jordan nor Roth was aware that a "surplus event" was going to be declared.

In or around late January, 2013, defendant declared a "surplus event" within the SCG, whereby the defendant sought to reduce headcount to close a budget gap.  Twelve Affected Work Groups ("AWGs") were involved in the surplus, across which a total of 47 positions were to be eliminated. Plaintiff was a Service Executive in AWG No. 5, where six of the 51 Service Executive Positions ultimately reporting to Jordan were to be eliminated, thus leaving 45 Service Executives in AWG No. 5.

On January 29, 2013, Jordan was provided with a template that was to be used in connection with the surplus event.  Two (2) of the four (4) rating categories—Performance and Leadership—had already been pre-populated with the scores that had recently been provided in connection with the year-end calibration session. The two (2) new categories—Skills and Experience—were blank. Jordan took it upon himself to enter scores for everyone in these two (2) new categories.

3

The following day, on January 30, 2013, Jordan sent his "first crack" surplus ratings to his direct reports. Roth made no changes to the ratings that Jordan had given to plaintiff or any of the Service Executives reporting to her. Based on these four equally-weighted criteria, plaintiff received a final ranking of 2.75 which was comprised of Performance (3), Leadership (3), Skills (2) and Experience (3). Based solely on this rating and ranking process occurring as a result of the surplus event, plaintiff and five other Service Executives in AWG No. 5 placed "below the line" and were, therefore, selected for surplus status.

Plaintiff received his Surplus Notification Letter on March 1, 2013. As an employee placed on surplus status, plaintiff was provided with two options: he could 1) continue his employment with defendant through April 30, 2013, and, during that time, apply for other positions within the Company; or (2) choose to terminate employment effective March 22, 2013. Plaintiff chose the first option and remained with defendant through April 30, 2013. In June, 2013, plaintiff began receiving his pension benefits.

Maritza Gonzalez ("Gonzalez"), one of the 45 Service Executives in AWG No. 5 not placed on surplus status was assigned by Jordan to replace plaintiff on the Fiserv account. At the time, Gonzalez was 36 years old and had been with defendant since 1998. She had no experience working on the Fiserv account.

**STANDARD OF REVIEW**

A motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) "should be granted only if, viewing the evidence in the light most favorable to the non-movant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find" for the non-movant. *Lightning Lube,*

*Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993); *Mandile v. Clark Material Handling Co.*, 131 Fed. Appx. 836, 838 (3d Cir. 2005).

In making this determination, "the court may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version." *Lightning Lube*, 4 F.3d at 1166 (citing *Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 190 (3d Cir. 1992)).

"The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find a verdict for that party." *Id*. (quoting *Patzig v. O'Neil*, 577 F.2d 841, 846 (3d Cir. 2004) ("A judge may overturn a jury verdict only when, as a matter of law, the record is critically deficient of that minimum quantity of evidence from which a jury might reasonably afford relief.")(quotations omitted)).

**DISCUSSION**

Under the ADEA, an employer is prohibited from discharging any individual or otherwise discriminating against an individual with respect to compensation, terms, conditions, or privileges of employment, because of an individual's age. 29 U.S.C.§ 623(a)(l). When analyzing claims under the ADEA and PHRA where, as here, there is an absence of direct evidence of discrimination, the Court applies the burden-shifting framework set forth in *McDonnell-Douglas v. Green*, 411 U.S. 792 (1973).

Ordinarily, to make out a prima facie case under *McDonnell Douglas* in an ADEA case, "the plaintiff must show (1) that he was at least forty years of age or older, (2) that the defendant took an adverse employment action against the plaintiff, (3) that he was qualified for the position in question and (4) that the plaintiff was ultimately replaced by

5

another employee who was sufficiently younger to support an inference of discriminatory animus. *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009).

"In the context of a reduction in force, in order to satisfy the fourth element of a *prima facie* case under the ADEA, a plaintiff must show that the employer retained a sufficiently younger *similarly situated* employee." *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 301 (3d Cir. 2004) (emphasis added) (citing *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 249-50 (3d Cir. 2002)). To be "similarly situated," there must be evidence that the retained employee had duties that were comparable to those of the plaintiff. *Monaco*, 359 F.3d at 305; *Anderson*, 297 F.3d at 250.

The main thrust of defendant's motion for judgment as a matter of law is that plaintiff did not establish the fourth element of a *prima facie* case of age discrimination in a reduction in force context because, according to defendant, the evidence at trial established that it was Jordan who made the relevant decision to place plaintiff on surplus status and that it is undisputed that Jordan never met plaintiff and did not have access to plaintiff's personnel file. According to defendant, because plaintiff failed to prove that Jordan *knowingly* retained younger employees at plaintiff's expense, or that Jordan *knowingly* replaced plaintiff him with a similarly situated younger employee, there was no evidence to support an inference of discriminatory animus.

In general, after a verdict has been rendered by the jury, courts do not review whether the plaintiff introduced sufficient evidence to establish a *prima facie* case of discrimination. *U.S. Postal Service Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); Bruno v. W.B. Saunders Co., 882 F. 2d 760, 764 (3d Cir. 1989).* However, our Court of Appeals has stated that "[a]lthough we do not address this contention in terms of the

6

*prima facie* case, it may be that our inquiry into the sufficiency of the evidence to support . . . an inference [of discrimination] will not differ markedly from an inquiry into whether the plaintiff has introduced evidence sufficient to establish one of the elements essential to her *prima facie* case." Id., at 764 n.2 (citations omitted)). Therefore, the Court will proceed to analyze whether there was sufficient evidence to establish a *prima facie* case of age discrimination.

Our Court of Appeals has indeed held that in order for an employer to be liable for intentional discrimination, the relevant decision maker must be aware of a plaintiff's protected status. *See Sarullo v. U.S. Postal Serv*., 352 F.3d 789, 799 (3d Cir. 2003) ("Absent knowledge of [the plaintiff]'s age, [the defendant]'s decision not to [hire] him does not raise an inference of age discrimination."); *Geraci v. Moody-Tottrup, Intern., Inc.*, 82 F.3d 578, 581 (3d Cir. 1996) ("We cannot presume that an employer most likely practices unlawful discrimination when it did not know that the plaintiff even belonged to the protected class."); see also *id*. ("[I]t is counter-intuitive to infer that the employer discriminated on the basis of a condition of which it was wholly ignorant, and in this situation the bare *McDonnell Douglas* presumption no longer makes sense."); *See also Harris v. Dow Chem. Co*., 586 Fed. App'x. 843, 846 (3d Cir. 2014) ("[A]n adverse employment action does not in isolation raise such an inference [of age discrimination]; rather, the inference may be raised only if the relevant decision-maker has knowledge of the plaintiff's status as a protected class member.")(not precedential)

As we noted in our decision denying defendant's motion for summary judgment, there was a dispute as to the material fact as to who made the relevant decision to place plaintiff on surplus status. (ECF 64 at p.7 n.2.) Defendant argued that the record revealed

that the relevant decision maker was Jordan, while plaintiff insisted the relevant decision maker was Roth.

During trial, on cross examination, Roth denied that she made the relevant decision, claiming that she only provided the ratings and rankings which ultimately resulted in plaintiff receiving a surplus designation. (ECF 94 at 160-161.) However, Roth was twice impeached on this issue by plaintiff's counsel as follows:

> Q: Now, you ultimately made the decision to terminate Mr. Gerundo, correct?
> A: No, I didn't.
> Q: Okay, I'm going to ask you to turn to your deposition again.
> …..
> Q: The question asked of you was, "Who made the decision to terminate his employment with AT&T? Your answer: "Well, ultimately, I guess, I would have to say myself." Do you see that?
> A: Yes.

(ECF 93 at 202.)

> Q: When you were on direct examination, you said you didn't make the decision for him to be surplussed, right?
> A: Correct.
> Q: But we already established when we first had the opportunity to talk that you were the ultimate decision maker in the termination, correct?
> A: I provided the rating and rankings…which ultimately resulted in him receiving a surplus package. I take responsibility for that.
> Q: If you could turn to your deposition, page 10, please?
> …..
> Q: "Who made the decision to terminate his employment with AT&T?"
> "Well, ultimately, I guess, I would have to say myself." That was your testimony, correct?
> A: Yes.

(ECF 94 at 160-161.)

Indeed, the Court recalls that Roth was an extremely evasive and, at times, disingenuous witness. Roth was impeached several times by plaintiff's counsel (ECF 93

8

at 192-194; ECF 93 at 202; ECF 94 at 60-61; ECF 94 at 82-83; ECF 94 at 151-153; ECF 94 at 160-161), including a particularly effective video impeachment concerning the reason why Roth would simply not keep plaintiff on the Fiserv account since he was doing a good job. (ECF 94 at 86-87.) On some occasions, the Court had to directly question Roth in order to elicit a non-evasive response. (ECF 93 at 225-226; ECF 94 at 143-144.) Roth rarely answered a question with a "yes," "no," I don't' know," or "I don't remember" and then providing an explanation. Having witnessed Roth's demeanor on the stand, the jury apparently did not credit Roth's trial testimony that she was not the relevant decision maker.

The jury further heard evidence that Roth had met plaintiff in person on one occasion in the fall of 2012. (ECF 93 at 199.) The jury heard Roth testify that upon meeting plaintiff in person in 2012, she believed him to be in his "mid to late 40's." (ECF 94 at 143-144.) With no offense to plaintiff, it would be obvious to any reasonable individual that met plaintiff, that he appears to be substantially older than in his "mid to late 40's." Even Roth herself testified that at some point during their meeting, she said to plaintiff, "You're not planning on retiring anytime soon, are you?" (ECF 93 at 199.) Why would she ask that to someone she thought was in his mid to late forties? Her statement borders on the ridiculous. Obviously, the jury did not find Roth's belief as to plaintiff's age to be credible.

Or, in the alternative, the jury could have concluded that Jordan was the relevant decision maker and inferred that he learned of plaintiff's age from Roth during their calibration sessions in which they determined the final rankings of their direct reports for 2012, including plaintiff. The jury could have further inferred that Jordan was aware of

plaintiff's age when he took the "first crack" at the surplus rankings. The jury also heard testimony that defendant had very few, if any, safeguards in place to ensure that managers like Roth and Jordan did not use bias in filing out these surplus rankings.

To be sure, defendant also presented evidence on this issue. The jury believed the plaintiff's version of the facts and disbelieved the defendant's version. As long as there is a minimum quantum of evidence to support the jury's decision (as detailed above), this Court will not second guess the jury.

Establishment of a prima facie case creates a presumption of discriminatory intent that a defendant has the burden to rebut by setting forth some legitimate non-discriminatory reason for its actions. *McDonnell Douglas*, 41 U.S. at 802. If the employer does so, the presumption of discrimination drops out and the plaintiff must then "demonstrate that the employer's proffered rationale was a pretext for age discrimination." *Smith v. City of Allentown*, 589 F.3d at 689.

In order to demonstrate pretext, plaintiff "must point to some evidence, direct or circumstantial, from which a fact finder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Iadimarco v. Runxon*, 190 F.3d 151, 165-66 (3d Cir. 1999)(emphasis in original)( quoting *Fuentes v. Perskie*, 32 F. 3d 759, 764 (3d Cir. 1994)). Plaintiff cannot "simply show that [defendant's] decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [defendant], not whether [defendant] is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 765.

Instead, plaintiff must demonstrate "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [defendant's] proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence, and hence infer that [defendant] did not act for the asserted non-discriminatory reasons." *Id*. (emphasis in original). Ultimately, plaintiff must prove that age was the but for cause of his termination. *Gross v. FBL Financial Services. Inc*., 557 U.S. 167, 176 (2009).

When viewed cumulatively, ample evidence existed in the record from which the jury could either "disbelieve the defendants' articulated legitimate reasons or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F. 3d at 764. Such evidence included, *inter alia*:

(1) Roth wrote the following comments for plaintiff's mid-year performance review for 2012: **"**Jack continues his good work in support of Fiserv. He is on the front line every day either at the client's location in Philly or from his office working tickets. His client respects the value that Jack provides them while working their issues; Jack has reestablished stewardship at the Executive level. Every month a Fiserv VP-Ken Windfelder joins the call. Ken has been very complementary of the information that is provided. During recent talks about new SLA's Ken made clear that he likes what he is getting in those reports." (Joint Exhibit 13); (ECF 93 at 90-92.)

(2) Roth wrote the following comments for plaintiff's year-end review for 2012: "Jack continued through 2012 as the primary contact for Fiserv's ticket escalations, which take time and energy, and often bleed into the evening and weekend hours. With so many varying business units and contacts, it can be challenging to keep everyone happy. Jack

11

works very diligently to do that, and knows who the key constituents are (e.g. Ken Windfelder). ln addition, Jack prepares the monthly stewardship reports, and provides some of the analysis associated with it, especially trouble tickets. As we approached the end of the year, the client executed the ETS contract along with the custom SLAs which we are managing. The good news is that we are adding headcount to the team, and during 2013 Jack will have more opportunity to shine. Dividing up his current duties with other team members will allow us to use Jack's strengths to greater success with the client; Jack has done a good job of building relationships up and down at Fiserv. They value what he does for them. They also provide him with information about what is really going on. Jack's strengths are in working with different groups of people at AT&T and Fiserv. He knows how to get these different groups to work as a team." (*Id.*)

Yet, despite these very positive comments, Roth gave plaintiff all "3s" in the calibration session categories, including Performance and Leadership, and did not object to Jordan's "first crack" surplus ratings for plaintiff of "2" for Skills and "3" for Experience."   Plaintiff received a "3 out of 5" for experience despite being with the company for many years.

 (3) The rating categories for the 2012 year end annual review and the 2013 surplus were all, for the most part, subjective (ECF 95 at 74; ECF 95 at 174.) The defendant had very few, if any, safeguards in place to ensure that the managers were not acting with bias in compiling the ratings and rankings (ECF 95 at 176-181.); There was not even a significant amount of time between the two evaluations.

(4)  Jordan assigned rankings for the "Experience" and "Skills" categories, that were used to determine which employees would be placed on surplus status, that were not

based on any actual evaluation of the employees' experience and skills. (ECF 95 at 50-58, 64-65.)

(5) As an example that shows the problem with the system, in assigning ratings for Susan Hubbard and Doug Thompson (both of whom were old enough to be eligible for retirement and wanted to retire), Jordan gave them false ratings on the "Experience" and "Skills" categories ("2s" for both individuals on both categories) so that they would fall at the bottom of the rankings and be selected for surplus. (ECF 95 at 53-56, 64.)

(6) As of the end of 2012, plaintiff's rankings were tied with that of Roth's thirty three (33) year old direct report, Jason Apple, and her forty seven (47) year old direct report, Monica Smith-Kuykendoll, but when the January 2013 surplus rankings were completed – Apple received a "4" for Skills and a "4" for Experience and Smith-Kuykendoll received a "4" for Skills and a "5" for Experience, while 66 year old plaintiff, as a result of receiving a "3" for Experience and a "2" for Skills, was moved to the bottom (ECF 50-58, 65, 69); Smith-Kuykendoll received a "5" for experience, despite having joined the defendant as a service manager only two years earlier in October, 2010. (ECF 94 at 36.) There was no documentation to explain why plaintiff received a "3" for experience and Smith-Kuykendoll received a "5" for experience. (ECF at 53-54). Although Jordan testified that he gave Smith-Kuykendoll a "5" for experience "in order to give her the benefit of the doubt" since she had just joined the organization in November or December 2012 (ECF 95 at 50), the jury heard evidence that Smith-Kuykendoll actually started with the defendant in October of 2010. (ECF 94 at 36.)

(7) Lois Smith, the highest-ranking Human Resources manager in defendant's organization and who was involved in the surplus, admitted that assigning ratings for

13

"Experience" and "Skills" that were not actually based on an employee's "Experience" and "Skills" violated defendant's policies and would result in concern that the false ratings were influenced by bias. (ECF 95 at 166, 181-182.)

(8) Defendant's Chief of Staff, Karin Johnson ("Johnson"), the person responsible for ensuring that there was no bias in the decision-making process, told the managers regarding the employees who were placed on surplus status, including sixty six (66) year old plaintiff that the question was – "is it time for them to leave AT&T or move out of the SM organization." (ECF 95 at 129.)

(9) Johnson told Jordan by email regarding the surplus process that her goal was as follows: "And I would love to keep us all out of jail." (ECF 95 at 130.)

(10) Defendant was inconsistent regarding the reason(s) for placing plaintiff on surplus status – First asserting that his position was eliminated to reduce headcount, but then replacing him on the Fiserv account (in which headcount was not reduced) with a thirty six (36) year old employee who had no prior experience on the Fiserv account.

(11) Defendant was inconsistent regarding the reason(s) for placing plaintiff on surplus status by asserting, first, that he was not placed on surplus status due to any performance deficiencies, and then, asserting that he was placed on surplus status because of (alleged) performance deficiencies such as not completing certain training requirements and not being on site enough at Fiserv's Philadelphia location. The jury heard evidence that these alleged performance deficiencies, either alone or taken together, were not the reason plaintiff received the rankings he did or were the reason plaintiff was placed on surplus status.

(12) Defendant asserted that plaintiff was placed on surplus status because he was "unwilling" and unable to do the tasks that were required by the new contract with Fiserv, a position contradictory to the testimony of Fiserv's Vice President, Kenneth Windfelder, who testified that he thought that plaintiff did a good job with Fiserv and that he had no concerns about plaintiff's ability to handle any aspect of the current, or modified, Fiserv contract. (ECF 95 at 4-27.) Defendant could not point to any documentation from Fiserv that would indicate that Fiserv believed plaintiff could not handle "complex systems" in the future. (ECF at 64.)

(13) The parties stipulated to the contents of Exhibit P-10 which included the following statistics:

(a) 42 of the 47 employees that were placed on surplus status were 40 years of age or older

(b) All of the employees in Jordan's group that were placed on the surplus list were over the age of 40.

(c) All 21 of the Service Executives that were placed on the surplus list were 40 years of age or older.

(ECF 95 at 190-191.)

Based on the above discussion, the defendant's renewed motion for judgment as a matter of law is denied.